0444

The STATE, Respondent, v. Edward F. MERRIMAN, Appellant.
The STATE, Respondent, v. Paul MAZZELL, Appellant.
(337 S. E. (2d) 218)

Court of Appeals

*Asst. Appellate Defender Daniel T. Stacey,* Columbia, *for appellant E. Merriman.*

*Tara D. Shurling, Asst. Appellate Defender,* Columbia, *for appellant P. Mazzell.*

*Atty. Gen. T. Travis Medlock, Asst. Attys. Gen. Harold M. Coombs, Jr.;* and *Charles H. Richardson* and *Staff Atty. Amie L. Clifford,* Columbia, and *Sol. Charles M. Condon,* of Charleston, *for respondent.*

Heard Nov. 12, 1984.

Decided April 19, 1985.

Order on Rehearing Nov. 8, 1985.

GARDNER, Judge:

Appellant Paul Mazzell (Mazzell) and his codefendant Eddie Merriman (Merriman) were convicted of conspiracy, kidnapping and murder in the death of Rickie Seagraves

(Seagraves). Their appeals were consolidated for argument and decision by this Court. We affirm.

This court is required to address each question raised on appeal necessary for decision; consequently each of such questions, whether raised individually or by both appellants, will be addressed.

We have divided consideration of the questions into four broad categories.

## FACTS

Seagraves was murdered on October 30, 1978, near Charleston, South Carolina. His body was not discovered until 1981, when Danny Hogg, then in prison for an unrelated crime, turned state's evidence.

The victim and the alleged perpetrators were the persons connected with the Charleston drug underground.

Danny Hogg was granted immunity from prosecution in return for his testimony about the kidnapping and murder of Seagraves. Hogg acted as a muscle man for organized crime in Charleston. His own testimony reveals him to be a drug dealer, a kidnapper, and a murderer. Hogg testified that he and Merriman worked for Mazzell, that Mazzell first directed them to employ another person to kill Seagraves but that this person refused to accept the propositions and that Mazzell then directed him and Merriman to get Seagraves so that he might kill him and that on October 30, 1978, Hogg and Merriman found Seagraves making a telephone call outside of Majik Market, a convenience store, in Charleston County, S. C. Hogg and Merriman, according to Hogg's testimony, drove into the parking area of Majik Market at which time Seagraves ran into the store. Hogg testified that he and Merriman chased Seagraves into the store and into a back room of the store and there beat him before dragging him to their pickup truck; they then, according to Hogg's testimony, delivered Seagraves to Mazzell and Mazzell killed him. The body was secretly buried in Merriman's yard and discovered two years later when Hogg turned state's evidence.

There is evidence of record that Hogg killed Seagraves. This evidence will be discussed under the subheading of Constitutional Questions.

## I.

## PROSECUTORIAL MISCONDUCT

Mazzell and Merriman argue that the trial judge erred in not granting a mistrial because of alleged prosecutorial misconduct.

It is alleged that four witnesses were threatened to the extent that three of them refused to testify and one testified only after his attorney received assurances from the court and the solicitor that he would not be the subject of harassment.

The first such witness was voluntarily released from his subpoena by defense counsel. There was no proffer of his testimony. In the absence of such a proffer, we cannot determine the materiality of the evidence he might have presented and for this reason, the question is not properly preserved on appeal. *State v. Cabbagestalk*, 281 S. C. 35, 314 S. E. (2d) 10 (1984).

The second and third witnesses were placed on the stand where they refused to answer questions; they testified that they were afraid to answer the questions because they had been threatened by an officer of the State Law Enforcement Division (SLED) and an agent of the solicitor's office; there is evidence of record that this testimony was a planned fabrication. The trial judge carefully investigated the allegations and made a factual determination that these threats had not taken place; his decision was supported by the evidence, and we so hold. Where there is evidence to support a finding of fact by the trial judge of a criminal case, his finding of fact is conclusive. *State v. Moultrie*, 261 S. C. 14, 198 S. E. (2d) 231 (1973); 24A C.J.S. *Criminal Law*, Section 1832.

After receiving assurances from the trial judge, the fourth witness testified. There is no contention that the witness's testimony was affected by any alleged threats. This exception is without merit.

Mazzell also alleges prosecutorial misconduct because the police deliberately supplied news media with information which was false and misleading. While we agree with the trial judge's characterization of the police conduct as horrendous and ridiculous, we also agree with his conclusion that the record is devoid of any evidence of actual

prejudice to the appellants. The news reports took place after the venire was seated but prior to the impaneling of the petit jury. The jury venire was carefully cautioned not to listen to or read any news accounts of the case. This was a capital case and the jury was carefully examined on voir dire and it was determined that none of the panel was exposed to erroneous broadcasts. In the absence of prejudice there is no reversible error. *State v. Greene*, 255 S. C. 548, 180 S. E. (2d) 179 (1971). We observe, however, that police misconduct such as this is punishable by contempt of court. While we find no error affecting this decision, this court does express its serious concern about this type conduct.

## II.

### TESTIMONY OF CONVICTED PERJUROR

During the state's case, it offered as a witness Carl Eugene Hines, who had been convicted of perjury. Both appellants objected, citing Section 16-9-10, Code of Laws of South Carolina (1976), which prohibits the testimony of convicted perjurors. The court allowed the testimony on the basis of Section 19-11-60, Code of Laws of South Carolina (1976), which provides that no person convicted of any crime shall be barred from testifying.

Section 16-9-10 was passed in 1712 and represents a codification of the common law. As a matter of fact, the common law prohibited any person convicted of an infamous crime from testifying. However, Section 19-11-60 was passed in 1934; its language is clear, unequivocal and unambiguous. Section 16-9-10 cannot be reconciled with Section 19-11-60; the two statutes are inconsonant and inconsistent with each other insofar as Section 16-9-10 prohibits testimony of a convicted perjuror and we so hold. We therefore hold that Section 16-9-10 was, insofar as it prohibits the testimony of a convicted perjuror, repealed by implication upon the enactment of Section 19-11-60.

## III.

### ALLEGED DISQUALIFICATION OF JUROR

It is next asserted that the foreman of the jury, Reginald Boone, was the nephew of a SLED agent who was involved in the investigation of the case and

for that reason a new trial should have been granted.

The relationship was not disclosed on voir dire, however, it was discussed in court immediately after the jury retired; thus, the appellants knew of the relationship before the verdict was rendered. No motion was made nor objection taken prior to rendition of the verdict.

The case of *State v. Williams*, 266 S. C. 325, 223 S. E. (2d) 38 (1976), is controlling on this point. There a witness was not qualified to sit on the jury because he had been a juror in a previous trial of the same case. The defendant was aware of this disqualification before the jury returned its verdict and the court observed:

> . . .[H]e was aware of a possible disqualification before the jury returned its verdict. Under these circumstances he is not entitled to a new trial, and there was no abuse in failing to inquire further into the matter. *State v. Williams*, 266 S. C. 325 at 336, 223 S. E. (2d) 38 at 43 (1976).

## IV.

## EVIDENCE QUESTIONS

The trial court refused to grant a mistrial based on the following testimony of a SLED agent:

> The following exchange took place.
> SOLICITOR: Q. SLED's assistance was requested how in the investigation.
> CALDWELL: The first overt act we did in initiating the investigation is we took the information and we believed from the information that Danny Hogg, Paul Mazzell, Eddie Merriman. . . .
> COUNSEL: Objection.

Appellant Mazzell argues that this exchange was prejudicial and that it amounts to prosecutorial misconduct and that a mistrial should have been granted. The objection was well taken. The clear implication of the testimony results in an opinion by the SLED agent concerning the very issue to be decided by the jury. The trial court, however, gave a very thorough curative instruction. We hold that the prejudice was corrected by this instruction. *State v. Craig*, 267 S. C. 262, 227 S. E. (2d) 306 (1976).

Both appellants allege error in the court's failure to grant a mistrial based on the following testimony of state's witness David L. Emond on redirect:

Q. And he [Seagraves] offered to sell you those pistols.
A. More than one time.
Q. Okay. Did you purchase those pistols?
A. No.
Q. Why?
A. Well, as soon as these people had found out that he was unarmed, I'm sure they would have come after him.

The following colloquy took place between the solicitor, both defense counsels and the court.

MR. GIBBS: Your Honor, you know, I mean, I object, and I again move for a mistrial. We have this orchestration between the Solicitor and the witness. Any chance they get, they come out with this inadmissible stuff.
THE COURT: You keep fishing, Mr. Stoney.
MR. STONEY: He opened the door —
THE COURT: No.
MR. STONEY: I'll withdraw the question. No further questions.
THE COURT: All right sir. Thank you, sir. Step down. You just alluded to a motion, Mr. Gibbs, do you wish to —
MR. GIBBS: Let's just add it to the last one and at some point I think it will become overwhelming if this continues.
THE COURT: All right sir.
MR. CRAVEN: Your Honor, I would like to be included in that, also.
THE COURT: All right, sir.

It is elementary that an objection to the admission of evidence must be upon a specific ground. *State v. Crowley,* 226 S. C. 472, 85 S. E. (2d) 714 (1955). No such ground was stated. Furthermore, when offered the opportunity to argue this motion, counsel failed to do so. Finally when arguing his general motion for a mistrial based on prosecutorial misconduct he failed to argue this instance. We find no merit to this contention.

Both appellants appeal the court's refusal to grant a mistrial based on the following testimony of Emond:

Q. Where have you been staying over the last week or ten days. Not where but under what circumstances.
A. Protective custody.

This is a rather egregious example of prosecutorial ██ misconduct. The question clearly elicited the reply which it received. The trial judge noted that the issue of where the witness was housed prior to trial was irrelevant to the issues before the jury and that there was accordingly no justification for the Solicitor's engaging in this dangerous line of questioning. And the reply was prejudicial.

The general rule is that references to threats or dangers to prosecuting witnesses are improper unless testimony is offered connecting the defendants with the threats of danger. *See U. S. v. Rios*, 611 F. (2d) 1335 (1979). The court, however, gave a very careful curative instruction to disregard the answer. In our opinion, the instruction given was full and complete and cured any prejudice. *State v. Craig, supra.*

After Mazzell was indicted, a witness, Carl Hines, was ██ instructed by the Charleston police to call him and if possible to elicit information. The use of information so obtained would violate Mazzell's due process rights. *Massiah v. United States*, 377 U. S. 201, 84 S. Ct. 1199, 12 L. Ed. (2d) 246 (1964). However, there was no showing that any information was received by the state which in any way aided their investigation and, indeed, as the appellant's brief concedes the state did not attempt to introduce any evidence which might have been illegally obtained. There is no prejudice here and we so hold. Error without prejudice is not the basis for a new trial. *State v. Greene*, 255 S. C. 548, 180 S. E. (2d) 179 (1971). ·

V.

## CHARGES RELATING TO SELF-DEFENSE AND MANSLAUGHTER

Merriman next asserts that because of the testimony of his witness, Jo Ann Lester, that the trial judge erred in not

making a requested charge of self-defense and manslaughter.

Jo Ann Lester testified that Hogg told her that when he and Merriman drove into Majik Market's parking area, Seagraves saw them and shot at them nearly hitting them; she further testified that Hogg returned the fire, "nailing him (Seagraves) with the first shot." However, witnesses at Majik Market testified that two shots were fired from the truck and that the assailants chased Seagraves into the back room of the store and dragged him out.

The elements of self-defense are set forth in the case ██ ██ of *State v. Davis*, 282 S. C. 45, 317 S. E. (2d) 452 (1984).

At least two of these elements are indisputably not present in this case. First, the party invoking the defense must be without fault in bringing about the altercation. Here Hogg and Merriman were seeking the victim. Second, there is a duty to retreat unless one is on his own premises. The altercation in the instant case took place in a parking lot adjacent to a convenience store. Far from retreating, Merriman and Hogg pursued the victim into the store. Here there was no retreat, rather pursuit. We reject this argument and so hold.

The evidence also fails to support a charge of man- ██ slaughter. At best Merriman might argue mutual combat. "Where two persons mutually engage in combat, and one kills the other, and at the time of the killing it be maliciously done, it is murder. If, on the other hand, it be done in sudden heat and passion on sufficient provocation without premeditation, or malice, it would be manslaughter." *State v. Graham*, 260 S. C. 449, 196 S. E. (2d) 495 (1973). The record clearly reflects that the killing was intentional and maliciously perpetrated. This contention has no merit and we so hold.

Merriman challenges the wording of the trial court's ██ charge on malice. He charged that from the use of a deadly weapon malice might be inferred and this is the law of this state. The trial judge did not charge that a presumption of malice arises from the use of a deadly weapon. For a review of the present law relating to this, *see* *State v. Gaskins*, 284 S. C. 105, 326 S. E. (2d) 132 (1985). Suffice it to say that we have read the judge's charge as a

whole and conclude that the charge fairly presented the law. We find no error here.

Merriman requested a charge which would have limited the consideration of prior bad acts[1] to the issue of motive. While such a charge would have been correct, we are not convinced that its omission constitutes reversible error. The court charged the presumption of innocence and reminded the jury that the defendants must be found guilty of the crimes charged in the indictments. *See State v. Green*, 278 S. C. 239, 294 S. E. (2d) 335 (1982).

Merriman's next exception alleges that the cumulative effect of the errors is so overwhelming as to require a mistrial. We disagree. As noted above, many of the exceptions raised by Merriman are without merit. In the other instances no prejudice has been shown.

## VI.

### CONSTITUTIONAL QUESTIONS

Merriman next asserts that the trial judge erred in permitting Hogg to testify because his testimony was known to be false. This exception has no merit. From Hogg's information the body was recovered in Merriman's yard and his testimony with respect to Merriman's involvement was corroborated by other credible evidence. The solicitor made a full disclosure of all information in his possession relating to Hogg's credibility. We hold that Merriman's due process rights under the South Carolina Constitution and United States Constitution were not infringed upon by the trial judge's refusal to disqualify Hogg as a witness.

Mazzell next raises a question[2] related to a rare situation. Before admission of Hogg's immunity agreement, the trial judge deleted from the agreement a requirement that Hogg take a lie detector test. Mazzell asserts error in the trial judge's deletion of the polygraph

---

[1] For a review of the admissibility of prior bad acts, *see State v. McClellan*, 283 S. C. 389, 323 S. E. (2d) 772 (1984).

[2] The reader must note that Merriman did not raise these questions and for good reason; the test results corroborate the overwhelming evidence of record of Merriman's participation in the crimes.

sentence and further asserts that the test results should have been admitted into evidence.[3]

It is now basic constitutional law that a citizen may ■ not be convicted by testimony known to the prosecution to be false; when the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence impugning his credibility falls within this rule. These rules, however, relate only to *disclosure* of admissible evidence. *But* this basic law has been extended in situations where immunity agreements are entered into with a witness on whom the state's case rests.

With this in mind, we turn to the immunity agreement. Hogg was in jail when the immunity agreement was entered into. The agreement was that he would be granted immunity for all crimes that he had committed and also that the state would assist him in getting out of jail. But, as noted, the immunity agreement contained a provision that Hogg would take a lie detector test; and this provision, over objection, was deleted from the immunity agreement before it was introduced. Additionally, the polygraph test indicated deception when Hogg was asked if he killed Seagraves and the Solicitor had been notified of this variance in Hogg's testimony.

Mazzell moved to introduce the entire immunity agreement and then to admit into evidence the results of the polygraph test. The trial judge overruled these motions. Mazzell argues this to have been error, citing, *Giglio v. United States*, 405 U. S. 150, 92 S. Ct. 763, 31 L. Ed. (2d) 104 (1972). In that case the defendant had been convicted by the testimony of one Taliento and Taliento's testimony, like Hogg's in this case, was crucial to the prosecution. Taliento had been promised immunity and the terms of the agreement had not been admitted into evidence at the trial. The heart of the opinion in *Giglio* is succinctly put by these words:

[5] Here the Government's case depended almost entirely on Taliento's testimony; without it there could

---

[3] Lie detector tests are generally inadmissible, regardless of whether they are offered by the prosecution or defense. *See State v. Copeland*, 278 S. C. 572, 300 S. E. (2d) 63 (1982). For a detailed discussion, *see also* 43 A.L.R. Fed. 68.

have been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it.

With this backdrop, we turn to the dilemma presented the trial judge. In this state the admission of evidence rests largely in the sound discretion of the trial judge. *Bankers Trust of S. C. v. Bruce*, 283 S. C. 408, 323 S. E. (2d) 523 (S. C. App. 1984). Here the trial judge was presented a situation in which he either had to delete the polygraph sentence before submission of the agreement to the jury or admit the entire agreement which would then logically require the admission of the test results; this is so because if the test results were not admitted the jury might infer that the polygraph test corroborated and bolstered Hogg's testimony. Polygraph tests are generally inadmissible as previously noted. Was it then, under *Giglio*, within the discretion of the trial judge to delete the polygraph sentence. We hold it was.

First, we do not believe the U. S. Supreme Court intended by *Giglio* that every detail of an immunity agreement should become admissible evidence regardless of its admissibility under generally accepted rules of evidence. Suppose, by way of *reductio ad absurdum*, the agreement had contained a provision requiring that Hogg be approved by some mystic or submit to some oracle to test his credibility. Obviously the trial judge would not admit as evidence such unrealistic means of testing credibility.

Next, while in *Giglio* we can easily understand the court's concern for requiring the most stringent test of the credibility of a witness on whose testimony the prosecution's case rests, we do not believe that *Giglio* is authority to divest a trial judge of his discretion in disallowing otherwise inadmissible testimony. To do so would make the rule a two-edge sword, thereby defeating the spirit of *Giglio*. Were our decision different, a prosecutor skilled in trial tactics, armed with our decision, and a polygraph test verifying the witness's testimony, might pervert the spirit of *Giglio* by using the agreement to bolster rather than question the credibility

of a witness. And in so doing an imaginative prosecutor might cause the jury to substitute the results of the polygraph for their own decision. This was neither the meaning nor the spirit of *Giglio;* there the court, we think, intended to make admissible any evidence tending to question the credibility of the witness provided the evidence was admissible under normal circumstances. We hold the deletion of the polygraph sentence of the immunity agreement to have been a wise and correct exercise of judicial discretion.

Finally, we are of the opinion that the polygraph results would not in any reasonable likelihood have affected the judgment of the jury as to Mazzell's guilt or innoncence. *See United States v. Ramos-Algarin,* 584 F. (2d) 562 (1st Cir. 1978). Mazzell apparently sought admission of the polygraph agreement and results to attack Hogg's credibility as a witness and to show Hogg actually killed Seagraves. However, Hogg's credibility was thoroughly impeached by other evidence, including his past criminal record, his own admission that he had given false testimony in a previous trial, and his admission that he was testifying in exchange for immunity which would be revoked if he turned out to be the triggerman in the Seagraves murder. The solicitor himself acknowledged to the jury that Hogg was not a believable person. Admission of the results of Hogg's polygraph examination would have been merely cumulative to the other evidence impeaching his credibility. Likewise other evidence was presented to the jury to prove Hogg killed Seagraves. Three witnesses testified that Hogg admitted he shot Seagraves. This testimony, had the jury believed it, was far better evidence of Hogg's guilt than results of a polygraph which "indicated deception." Since the polygraph results would have been cumulative to evidence already before the jury, we hold that exclusion of the test was not material to the jury's verdict. We therefore affirm the decision of the trial judge.

For the above reasons, the judgment below is affirmed.

Affirmed.

SANDERS, C. J., and BELL, J., concur.

## ORDER ON REHEARING

BELL, Judge:

We granted a rehearing in this case on the limited question of whether a witness is statutorily disqualified from giving evidence by his prior conviction for perjury.

Section 16-9-10, Code of Laws of South Carolina, 1976, provides that a convicted perjurer's oath shall not be received in any court of record in South Carolina. In our prior opinion, we held that this statute, a reception of 5 Eliz. c. 9 (1563) enacted by our Legislature in 1712, was repealed by the later enactment of Code Section 19-11-60, which provides that no person shall be disqualified to testify in the courts of this state by reason of his conviction and sentence for any crime.

On rehearing, Merriman and Mazzell argue that in so holding we overlooked Code Section 24-21-990(6), which provides a pardon shall restore to a person all civil rights lost as a result of conviction, including the right "not [to] have his testimony excluded in a legal proceeding if convicted of perjury." They contend Section 24-21-990(6) constitutes strong evidence that the Legislature has not repealed the statute of Elizabeth. The State, on the other hand, argues that Section 24-21-990(6) is merely declaratory of the common law relating to pardons and cannot reasonably be construed as an indication that the statute of Elizabeth is still in effect.

The narrow issue presented is whether Section 24-21-990(6) does anything more than declare existing common law.[1] If a person whose perjury conviction has been pardoned is competent to testify at common law then Section 24-21-990(6) is declaratory and does not affect the result in this case. For the reasons which follow, we conclude Section 24-21-990(6) is declaratory of the common law.

---

[1] The recodification argument developed by Judge Gardner in his separate concurring opinion was not raised in the petition for rehearing nor was it argued by counsel for Merriman and Mazzell. As the State has had no opportunity to be heard on this theory, we do not address it.

I.

The classic definition of a declaratory statute is found in Blackstone's *Commentaries:*

> Statutes ... are ... [d]eclaratory, where the old custom of the kingdom is almost fallen into disuse, or become disputable; in which case the Parliament has thought proper, in perpetuum rei testimonium and for avoiding all doubts and difficulties, to declare what the common law is and ever hath been.

1 W. Blackstone, *Commentaries*\* 86 (Chitty ed. 1844). Blackstone's definition is widely accepted in American decisional law. The only change has been to extend the concept to statutes which clarify the meaning of other statutes. *Personal Finance Co. of Braddock v. United States*, 86 F. Supp. 779 (D. Del. 1949); *Board of Comm'rs of Wyandotte County v. General Securities Corp.*, 157 Kan. 64, 138 P. (2d) 479 (1943). By definition, a declaratory statute does not change existing law, nor announce new law. It operates to express what formerly was only implied or was not clear. *See Nelson v. Sandkamp*, 227 Minn. 177, 34 N. W. (2d) 640, 5 A.L.R. (2d) 1136 (1948).

II.

At common law, convicted felons and perjurers were incompetent to testify in court proceedings. The rule has a long history. Its antiquity is attested by a detailed discussion in Glanvill, the oldest systematic treatise on the English common law (circa 1187). In addition to other penalties, Glanvill states that those duly convicted of perjury "shall lose their law for ever, and thus rightly incur the lasting mark of infamy. This penalty is justly ordained, so that the fear of such punishment shall prevent all men from swearing a false oath. ..." Glanvill, ii. 19 (G. Hall ed. 1965). A person who "lost his law" was no longer considered oathworthy and, according to Glanvill, "he shall never again be allowed as a witness in court." Id., ii. 3.

The same rule is confirmed in Bracton. In a section dealing with the punishment for those convicted of perjury, Bracton states:

> They incur perpetual infamy and lose the *lex terrae*, so that they will never afterwards b[e] admitted to an oath, for they will not henceforth be oathworthy, nor be received as witnesses, because it is presumed that he who is once convicted of perjury will perjure himself again.

Bracton, *On the Laws and Customs of England*, f. 292b, at 346 (S. Thorne ed. 1977). Later authorities are to the same effect. *See* 1 *Co. Inst.* 6b (11th ed. London 1719); 2 M. Hale, *Historia Placitorum Coronae*, c. 37, at 277 (Glazebrook ed. 1971) (1st ed. London 1736); 1 *Starkie's Law of Evidence*, 83 (Boston 1826).

Although conviction of a felony or perjury rendered the convict incompetent as a witness, the English cases also held a pardon of felony operated to restore a person's competency to testify. In the leading case of *Cuddington v. Wilkins*, (1614) Hob. 68, 80 Eng. Rep. 216, the court stated the king's pardon extinguishes a felony conviction and clears the convict of the crime and the infamy attending conviction. Later cases specifically recognized that a pardon restores competency to testify. *See, e.g., Sir Henry Fine's Case* (1623) Godb. 288, 78 Eng. Rep. 168; *Elizabeth Cellier's Case*, (1680) Raym. 369, 83 Eng. Rep. 192; *Rex v. Gully* (1773) 1 Leach 98, 168 Eng. Rep. 151; *Leyman v. Latimer* (1877) 3 Ex. D. 15; *Hay v. Justices of Tower Division of London* (1890) 24 Q.B.D. 561. *See also*, 2 Hale *P. C.* c. 37, at 278; 4 Bl. *Comm.*\* 402.

Despite this general rule, some doubt existed in the early seventeenth century about the effect of a pardon in the case of perjury. In *Brown v. Crashaw*, (1612) 2 Bulstr. 154, 80 Eng. Rep. 1028, Sir Edward Coke, then Chief Justice of the King's Bench, expressed the opinion that "if one be attainted of felony, and pardoned, he shall not afterwards be sworn of a jury, for that he is not *probus, & legalis homo."* Coke held to a similar view in cases of perjury. In the *Institutes* he states: "So odious was perjury, that by the law of God it was not to be pardoned: Non misereberis eius, & c." 3 *Co. Inst.* c. cv. (London 1797). However, Coke's view was rejected by the later authorities:

> [I]f the king pardon these offenders [including perjurers], they are thereby rendered competent witnesses,

> tho their credit is to be still left to the jury, for the king's pardon takes away poenam & culpam in foro humano, M. 12 Jac. B. R. Cuddington & Wilkins(b): but yet it makes not the man always an honest man, and there he shall not be a witness against the opinion of my lord Coke in Crashaw's case. . . .

2 Hale, *P. C.*, c. 37, at 278; *see also* 4 Bl. *Comm.*\* 402. The point was settled by Lord Chief Justice Holt in a series of decisions allowing the testimony of convicted perjurers who had been pardoned. *See Rex v. Crosby* (1695) 2 Salk. 689, 91 Eng. Rep. 584 (dictum); *Rex v. Griepe* (1697) 12 Mod. 139, 88 Eng. Rep. 1220; *Rex v. Ford* (1701) 2 Salk. 690, 91 Eng. Rep. 585; *Anon.* (1701) 3 Salk. 155, 91 Eng. Rep. 748 (all stating that at common law the king may pardon perjury and thereby wipe away the convict's disability as a witness); *accord Dover v. Maestaer* (1803), 5 Esp. 92, 170 Eng. Rep. 749.

### III.

These common law rules were altered by legislation in England. By the statute of 5 Eliz. c. 9 (1563), Parliament declared perjury to be a statutory crime and provided that no person convicted of perjury would thereafter be received as a witness in any court of record in the realm unless the conviction were reversed. Later cases interpreted this provision to take away the power of the king's pardon to restore a person to competency as a witness if he was indicted and convicted under the statute. *See, e.g., Rex v. Griepe* (1697) 2 Salk. 513, 91 Eng. Rep. 437; 2 Hawkins, *Pleas of the Crown* 548, § 52 (8th ed. 1824). However, the statute of Elizabeth did not change the effect of a pardon in cases of common law perjury. *See Dover v. Maestaer, supra* (testimony of witness admitted when he produced a King's pardon for conviction of common law perjury). Likewise, a pardon by act of Parliament would remove the disability even in the case of statutory perjury. *Rex v. Ford, supra.*

The law was again altered by the Evidence Act of 1843, 6 & 7 Vict. c. 85, which removed the incapacity of persons convicted of crime to give testimony in legal proceedings. *See* 1 Archbold, *Criminal Practice, Pleading & Evidence\** 155 (6th ed. New York 1853). Under the Evidence Act, a

convicted perjurer is competent to testify, but the fact of his conviction may be established and the jury may give it what weight they choose in determining the witness's credibility. *See* 17 *Halsbury's Laws of England,* § 231, at 162 (4th ed. London 1976).

## IV.

In South Carolina the law developed along similar lines. At common law, a person convicted of an infamous crime is incompetent to give testimony by reason of the conviction. *State v. Jeffcoat,* 148 S. C. 322, 146 S. E. 95 (1928). However, South Carolina also follows the common law rule that a pardon restores the competency of a convicted person as a witness. *See Jones v. Harris,* 32 S.C.L. (1 Strob.) 160 (1846). Section 24-21-990(6) merely restates this common law rule.

In South Carolina, as in England, the legislature altered the common law by receiving the statute of Elizabeth in its entirety. *See* Act No. 322 of 1712, 2 Stat. at Large 486. Insofar as it disqualified a convicted perjurer from giving evidence in subsequent legal proceedings, this statute was declaratory of the common law rule. However, to the extent it took away the power of a pardon to restore the capacity to testify, it altered the common law.

The law changed again when South Carolina enacted a statute similar in substance to the Evidence Act of 1843. *See* Act No. 632 of 1934, 38 Stat. at Large 1193 (currently codified as Section 19-11-60 of the 1976 Code). The 1934 Act provides:

> No person shall be disqualified to testify in the trial of any cause in the courts of this State by reason of conviction and sentence for any crime. The fact of such conviction and sentence may be established and the credibility of the testimony of any such witness shall be entirely for the Jury or the Court determining the facts at issue, as the case may be.

Section 2 of the 1934 Act is an express repealer of "[a]ll Acts or parts of Acts inconsistent with this Act." Because it disqualifies convicted perjurers from testifying, the statute of Elizabeth is inconsistent with the 1934 Act. To that extent, therefore, it was epxressly repealed by the 1934 Act.

The subsequent enactment of Section 24-21-990(6), rather than indicating the statute of Elizabeth is still in effect, provides further support for the conclusion that it has been repealed. Under the statute of Elizabeth, an executive pardon did not restore competency to testify. *Rex v. Griepe, supra; Houghtaling v. Kelderhouse*, 1 Parker Crim. Cas. 241 (N. Y. 1851). Under Section 24-21-990(6) a pardon does restore competency to testify. Thus, the statute of Elizabeth not only conflicts with the 1934 Act, but also conflicts with Section 24-21-990(6). In the face of these later enactments, we fail to see how the statute of Elizabeth retains any vitality in South Carolina law.

Section 24-21-990(6) is, of course, not directly relevant to this case, since Hines, the witness whose testimony is challenged by Merriman and Mazzell, never received a pardon for his perjury conviction. However, the later enactment of Section 24-21-990(6) is consistent with the repeal of the statute of Elizabeth by the 1934 Act. Hines's competency to testify derives from the 1934 statute, which not only repealed the statute of Elizabeth in South Carolina, but also altered the traditional common law rule rendering convicted criminals incompetent to testify unless they had been pardoned. The later enactment of Section 24-21-990(6) merely restates the common law rule relating to pardons. It does not alter the plain intent of the 1934 statute to permit testimony by convicted, but unpardoned, criminals.

Accordingly, we adhere to our earlier opinion. The stay of remittitur heretofore granted is revoked.

SANDERS, C. J., concurs.

GARDNER, J., concurs separately.

---

GARDNER, Judge (concurring in result):

I concur in the result because Hines' testimony was merely cumulative; there was testimony of record by witness Hogg which is the same as that given by Hines.

I, however, cannot agree with the reasoning of my brethren by which they adhere to the published decision —

this in spite of the fact that I authored the original opinion. Upon reconsideration I have changed my opinion and now believe that Section 16-9-10 is a viable statute.

In 1914, an en banc hearing of the Supreme Court and circuit judges of this state was held in the case of *Nexsen v. Ward*, 96 S. C. 313, 80 S. E. 599 (1914). An en banc hearing in *Nexsen* was called to determine the effect of Section 5 of article 6 of the Constitution of 1895, which provides for a codification of all the general statutes of the state every ten years and that the codes adopted under that provision shall be the only statutory law of the state. The court in *Nexsen* held that any matter not theretofore a part of the general statutory law of the state, became by virtue of its inclusion in the civil code of 1902, a part of the general statutory law of the state. The court said, *"that any matter which the legislature may constitutionally enact as law becomes such when it has been inserted in the Code and adopted with it."* 96 S. C. at 319, 80 S. E. at 601. (Emphasis mine.)

It is true, as the majority of this decision notes, that Act No. 632 of 1934 (currently codified as Section 19-11-60 of the 1976 Code) contains an express repealer and therefore repealed Section 16-9-10 from the enactment of Act No. 632 of 1934 until the adoption of the 1942 Code; nevertheless, under *Nexsen*, upon the adoption of 1942, Code[1] of Laws of South Carolina, Section 16-9-10 was reenacted and now, in the opinion of the writer, is a viable statute.

As noted, however, I concur with my brethren of the majority because Hines' testimony was merely cumulative.

---

[1] This statute was recodified in 1952, in 1963 (in which code it is cross-indexed with Section 19-11-60) and in 1976. It has thus been reenacted by legislative adoption of four South Carolina Codes.